Filed 6/13/13  P. v. Serrato CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B237489 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA085648) |
| v. | |
| MICHAEL ANGELO SERRATO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles D. Sheldon, Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Margaret E. Maxwell and Tasha G. Timbadia, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Michael Angel Serrato appeals from the judgment entered following his conviction of kidnapping to commit oral copulation or rape (Pen. Code,[1] § 209, subd. (b)(1)), making criminal threats (§ 422), forcible oral copulation (§ 288a, subd. (c)(2)), forcible rape (§ 261, subd. (a)(2)), dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)), and false imprisonment by violence (§ 236). Serrato's sole contention on appeal is that his trial counsel rendered ineffective assistance in failing to object to evidence of a knife recovered from his vehicle following his arrest, which the victim testified was not the weapon used in the commission of the crimes. Because there is no reasonable probability that Serrato would have achieved a more favorable result had his trial counsel objected to the admission of such evidence, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Evidence at Trial

On the afternoon of January 31, 2009, Esperanza G. and her 19-year-old daughter, Maria G., were visiting relatives when Serrato approached them.[2] Esperanza was friends with Serrato's mother and knew he recently had been released from prison. Serrato offered to pay Maria $80 to clean his small apartment. Although Esperanza did not want Maria to go with Serrato, Maria agreed because she needed the money to attend a local fair later that evening. Serrato arranged to pick up Maria at her home a short time later.

When Maria and Serrato arrived at his apartment, she began to clean. After cleaning the kitchen and living room, she knocked on Serrato's bedroom door. When he opened it, Maria saw a white bag containing powder, a spoon, a syringe, and a needle. She also noticed that Serrato had bruises on the interior of both arms near the elbow. Maria finished cleaning the apartment and told Serrato that she was ready to leave. He responded that he was charging his ankle bracelet and she would have to wait. After

---

[1]    Unless otherwise stated, all further statutory references are to the Penal Code.

[2]    For clarity and convenience, and not out of disrespect, we refer to Esperanza and Maria G. by their first names.

about 20 minutes, Serrato told Maria that he was ready, but he did not have the money to pay her.  He also said that they would have to go to his mother's nearby house to get her bank card and then withdraw the money from an ATM machine.

After a brief stop at his mother's house, Serrato drove Maria to a gas station to put gas in his vehicle.  Although the gas station had an ATM machine, Serrato did not use it.  Instead, he explained to Maria that the ATM at the gas station was too expensive and he intended to use an ATM at a Vons grocery store.  Once they left the gas station, Serrato began driving erratically, swerving in and out of traffic.  He then entered the 710 freeway.  When Maria questioned why they were not going to the Vons near his home, Serrato told her that there was a new Vons store on Willow.  Maria used her cell phone to call her boyfriend and while she was talking to him, Serrato suddenly told her to "[h]ang up that fucking phone."  Maria was frightened by the tone of Serrato's voice and "had a feeling that something was going to happen."

As Serrato was driving on the freeway, he reached into the back seat of his vehicle, grabbed a bottle in a black plastic bag, and took several drinks of a substance that smelled like alcohol.  At some point, Serrato became belligerent and told Maria, "You're a fucking bitch.  You think you're too good for me. . . . I'm going to get pussy whether you want to or not.  You're going to be mine.  I'm going to take you out of the state."  Maria begged Serrato to stop, telling him, "You always told my mom you consider yourself like a dad to me.  A dad would not do that to their daughter."  Maria also urged him to "think about [his] mom."  Serrato answered, "I don't give a fuck about my mom.  I don't give a fuck about my parole.  I'm going to take you out of state."  When Maria told Serrato that he was "really scaring [her]," he responded, "Oh, you want me to act like a maniac, that's how you want me to act."  He then reached into his pocket and retrieved a kitchen knife.  The knife was three to five inches long and had a wooden handle.  Serrato pointed the knife at Maria's head and said that he was "going to get fucking pussy, fucking bitch."

Serrato was merging onto the 405 freeway when he suddenly stopped his vehicle on the side of the road.  He pulled out his penis, pushed Maria's head down, and forced

3

her to orally copulate him. When Maria tried to stop, Serrato threatened that he knew where her mother and brother lived and he could have them killed by "just mak[ing] a call." At some point, Serrato resumed driving on the freeway. As he was driving, he again pushed Maria's head down toward his penis and forced her to orally copulate him. Maria was crying and continuously pleaded with Serrato to "stop, please." When Maria realized that Serrato was not going to let her go, she told him that he could do whatever he wanted to her at his house. Maria thought that would be her best chance to escape because she was familiar with the area and could try to run for help. Serrato told Maria that he did not believe her. He also repeatedly said, "I already told you . . . . I'm gonna fuck you, bitch. I already told you I'm gonna get pussy whether you want to or not."

After Serrato exited the freeway, Maria saw a police vehicle approaching from the opposite direction. Serrato warned Maria not to say anything, reminding her that he knew where her family lived and he "could just make a call and they'll be there in a quickness." Maria stayed quiet as the police vehicle passed. Serrato eventually stopped the car in an alley and ordered Maria to get into the back seat. Once in the back seat, he pulled down her pants and said, "I already told you I'm gonna fuck you bitch. I already told you I'm gonna get pussy whether you want it or not." Maria again pleaded with Serrato to stop and tried to push him off of her. Serrato grabbed Maria, threw her back, and forcibly raped her.

After they were parked in the alley for about 20 minutes, a woman in another vehicle honked at them to move because they were blocking her driveway. Serrato returned to the driver's seat and warned Maria not to say anything. He then drove to a nearby gas station and told Maria to stay in the car. As soon as he exited the vehicle, Maria grabbed her cell phone and called her mother. Maria was crying, frightened, and uncertain about what she should do. At Esperanza's urging, Maria ran from the vehicle and hid in some nearby bushes until Esperanza picked her up. Maria told Esperanza that Serrato had kidnapped and tried to rape her, but did not disclose the true nature of the sexual assault. When Esperanza insisted that they report Serrato to the police, Maria reluctantly agreed.

4

Later that evening, Esperanza received a telephone call from Serrato who claimed that he did not know where Maria was. He told Esperanza that Maria got out of his vehicle and into a van with some Black men. Serrato also said that he had "run them off with his car," "hit them," and "fought with them." Esperanza explained to Serrato that Maria was with her and had already told her what he had done. Serrato became quiet and then hung up the telephone. Three days later, on February 3, 2009, Serrato was arrested and his vehicle was impounded by the police. During a subsequent search of the vehicle, a knife with a silver handle was recovered from the rear area of the trunk.

In her initial interview with the police, Maria reported that Serrato had kidnapped and attempted to rape her. She did not describe the oral copulation or the actual rape at that time because she was afraid of Serrato's threats against her and her family. At the preliminary hearing, where Serrato was representing himself, Maria testified that he had touched her upper leg in a sexual manner, but again did not disclose the rape or the oral copulation. However, a few days prior to trial, at the urging of her therapist, Maria told the prosecuting attorney and investigating officer for the first time about the full extent of the crimes against her. At the time of trial, Maria was still afraid to be alone and continued to fear for her and her family's safety.

Ashley Morgan was a crime scene analyst for Satellite Tracking of People, a private company that produces and monitors ankle bracelets worn by parolees, including the one worn by Serrato on the day of the alleged crimes. Morgan testified that the bracelet operates like a "mini GPS system" and is able to accurately pinpoint the bracelet's location within 50 feet. Using a map, Morgan demonstrated the movement of Serrato's bracelet on January 31, 2009, starting at approximately 5:00 p.m. The tracking software showed that Serrato's bracelet was on 7th Street, the 710 freeway, the 405 freeway, and then stopped at a location that appeared to be an alley for about 30 minutes. Thereafter, Serrato's bracelet was at a gas station on East Spring Street for about 10 minutes, and then stayed in the same area of Long Beach Boulevard and East Spring Street for another 12 to 15 minutes before leaving that area.

## II.    Jury Verdict and Sentencing

The jury found Serrato guilty as charged of kidnapping to commit oral copulation or rape (§ 209, subd. (b)(1)), making criminal threats (§ 422), forcible oral copulation (§ 288a, subd. (c)(2)), forcible rape (§ 261, subd. (a)(2)), dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)), and false imprisonment by violence (§ 236).  As to each count, the jury also found true the allegation that Serrato personally used a deadly and dangerous weapon, a knife, in the commission of the crime (§ 12022, subd. (b)(1)).  In a bifurcated proceeding, the trial court found that Serrato had served six prior prison terms within the meaning of section 667.5, subdivision (b), and had suffered two prior serious or violent felony convictions within the meaning of section 667, subdivision (a)(1) and the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).  The trial court also found true the allegations that, with respect to the two sex offense counts, Serrato personally used a knife, committed a kidnapping that substantially increased the risk of harm to the victim, and had a prior conviction for rape (§ 667.61, subds. (a)-(e)).  Serrato was sentenced to a total state prison term of 86 years to life.  He thereafter filed a timely notice of appeal.

**DISCUSSION**

On appeal, Serrato argues that he received ineffective assistance of counsel in violation of his federal and state constitutional rights when his trial attorney failed to object to the admission of evidence concerning the knife recovered from his vehicle. Serrato specifically asserts that, because Maria testified that the seized knife was not the one used in the commission of the charged crimes, such evidence lacked any probative value and was highly prejudicial. The Attorney General contends that the knife was properly admitted as circumstantial evidence because it demonstrated the type and size of the weapon actually used by Serrato and tended to corroborate Maria's version of events. While we agree that the evidence of the knife recovered from the vehicle was not relevant to any of the charged crimes, we conclude that Serrato was not prejudiced by his trial counsel's failure to object to its admission.

## I.     Relevant Facts

At trial, the parties stipulated that, on February 3, 2009, three days after the commission of the alleged crimes, Serrato was arrested and his vehicle was impounded. During a subsequent search of the vehicle, a knife was recovered from the rear area of the trunk. The prosecutor showed Maria the seized knife during her trial testimony. Maria testified that the knife's blade was the approximate size of the one used by Serrato, but she believed it was not the same knife. As described by Maria, the knife shown to her at trial had a silver handle whereas the knife used by Serrato had a wooden handle. At the prosecutor's request, the trial court allowed the prosecutor to show the seized knife to the jury for "size purposes," and later admitted a photograph of the knife into evidence. Serrato's trial counsel did not object to the showing of the knife to the jury or to the subsequent admission of the photograph depicting the knife.

## II.     Relevant Law

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the

7

California Constitution." (*People v. Doolin* (2009) 45 Cal.4th 390, 417.) To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that trial counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Gamache* (2010) 48 Cal.4th 347, 391.) "'In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny . . .' and must 'view and assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act.' [Citation.]" (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) The showing of prejudice requires "'a reasonable probability that a more favorable outcome would have resulted . . ., i.e., a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) "A defendant must prove prejudice that is a '"demonstrable reality," not simply speculation.' [Citations.]" (*Ibid.*)

"'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Generally, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056 [trial court erred in admitting evidence of defendant's prior possession of handgun similar to murder weapon where prosecutor did not claim such weapon was actually used in murders]; see also *People v. Riser* (1956) 47 Cal.2d 566, 577 [trial court erred in admitting evidence of a Colt .38-caliber revolver found in defendant's possession two weeks after murders where evidence showed weapon actually used was a Smith and Wesson .38-caliber revolver], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648-649; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392-1393 [trial court erred in admitting evidence of knives recovered from defendant's residence two years after murder where knives were not murder weapon

8

and were irrelevant to show planning or availability of weapons].)  In other words, "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons -- a fact of no relevant consequence to determination of the guilt or innocence of the defendant.  [Citations.]"  (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360.)

On the other hand, evidence of weapons not actually used in the commission of a crime may be admissible when they are relevant for other purposes.  (*People v. Cox* (2003) 30 Cal.4th 916, 956 ["when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible"], disapproved on other grounds in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)  The critical inquiry is whether the weapons evidence bears some relevance to the weapons shown to have been involved in the charged crimes, or is being admitted simply as character evidence.  (*People v. Barnwell*, *supra*, 41 Cal.4th at pp. 1056-1057; *People v. Prince* (2007) 40 Cal.4th 1179, 1248-1249.)

## III.    Application to Serrato's Ineffective Assistance of Counsel Claim

In this case, the evidence concerning the knife recovered from Serrato's vehicle was not relevant to his commission of any of the charged crimes.  At trial, Maria was unequivocal in her testimony that the seized knife shown to her by the prosecutor was not the knife used by Serrato during the sexual assault.  Maria was also specific in her description of the knife actually used and testified that it was a kitchen knife with a wooden handle and was approximately three to five inches in length.  While the Attorney General reasons that the knife recovered from Serrato's vehicle was relevant to demonstrating the type and size of the knife used in the sexual assault, the general appearance of a three to five inch kitchen knife would have been within the common understanding of the jury without the need for such visual aids.  The average juror likely would be familiar with the dimensions of a standard kitchen knife and would not need to see a similarly-sized knife to understand the nature of the weapon used.

9

Additionally, contrary to the Attorney General's claim, the knife recovered from Serrato's vehicle was not relevant to corroborating Maria's version of events. Maria testified that the only weapon used in the commission of the crimes was the knife with a wooden handle which Serrato pulled from his pocket once Maria was already in his vehicle and he was driving on the freeway. The presence of a second knife in the trunk of the vehicle, which Serrato never accessed and of which Maria was never aware, was not probative on the issue of her credibility nor would it support an inference that Serrato ever intended to use that weapon in his commission of the charged crimes.

However, even assuming the performance by Serrato's trial counsel was deficient in failing to object to the admission of such evidence, Serrato cannot show that a more favorable result was reasonably probable.[3] The record reflects that, prior to showing the knife to the jury, the prosecutor clearly stated that it was being presented "for size purposes only." The prosecutor did not use the knife to argue to the jury that Serrato was the sort of person who surrounded himself with deadly weapons. In fact, the knife was only briefly referenced by the prosecutor in his closing argument wherein he stated: "The knife was actually not recovered. It looks similar to the one that was here that you have a picture of." Serrato's trial counsel also reiterated to the jury throughout his closing argument that it was undisputed the knife recovered from his client's vehicle was not the knife allegedly used in the charged crimes.

Moreover, the totality of the evidence supporting Serrato's convictions was very strong. At trial, Maria provided a detailed account of the kidnapping, forcible oral copulation and rape, and threats against her and her family. She also explained the fear and embarrassment she felt after the sexual assault which initially dissuaded her from

---

[3] Serrato's trial counsel also may have made a reasonable tactical decision to refrain from objecting to the evidence of the knife given Maria's unequivocal testimony that the knife shown to her at trial was not the one used in the assault as well as the prosecution's limited purpose in showing that knife to the jury. (*People v. Riel* (2000) 22 Cal.4th 1153, 1185 ["'[g]enerally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight'"].)

disclosing the full extent of the assault to anyone. Esperanza confirmed that, when Maria called her that night from her cell phone, she was frightened, crying, and reluctant to report any crime to the police because of Serrato's threats. Esperanza further testified that Serrato called her shortly after she was able to locate Maria near a gas station and told her an elaborate story about how Maria got out of his vehicle and into a van with several Black men with whom Serrato had fought. When Esperanza explained that Maria was with her and had told her what Serrato had done, he became quiet and then hung up the phone. In addition, the ankle bracelet worn by Serrato provided tracking data on his whereabouts the evening of the alleged crimes, which strongly corroborated Maria's version of events, including the approximate location and time at each of Serrato's stops.

Based on this record, Serrato has not demonstrated a reasonable probability that the outcome of his trial would have been any different had his trial counsel made a timely objection to the evidence concerning the seized knife. Serrato's ineffective assistance of counsel claim accordingly fails.

**DISPOSITION**

The judgment is affirmed.


ZELON, J.


We concur:



PERLUSS, P. J.



WOODS, J.

11